# **EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

| | |
|---|---|
| WILLIAM ANTONIO REYES MALDONADO a/k/a WILLIAM REYES MALDONADO a/k/a WILLIAM R. MALDONADO a/k/a WILLIAM A. REYES a/k/a WILLIAM MALDONADO, | Civil Action Index No.: |
| Plaintiff, | |
| -against- | **SUMMONS** |
| EQUIFAX INFORMATION SERVICES LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION LLC a/k/a TRANSUNION; WESTERN ALLIANCE BANK, successor-by-merger to AMERIHOME MORTGAGE COMPANY, LLC; UNION HOME MORTGAGE CORP. d/b/a UNION HOME MORTGAGE; and ALLY FINANCIAL, INC., | |
| Defendants. | |

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action, and to serve a copy of your answer on the attorneys for the Plaintiff at the address listed below, within twenty (20) days after the service of this Summons (exclusive of the day of service), or within thirty (30) days after completion of service where service is made in any other manner than by personal delivery within the State. The United States of America, if designated as a defendant in this action, may appear within sixty (60) days of service hereof.

**YOU ARE HEREBY NOTIFIED THAT**, should you fail to answer, judgment will be entered against you by default for the relief demanded in the complaint.

**VENUE:** Plaintiff designates Bronx County as the place of trial. The basis of this venue designation is the county in which Plaintiff resides.

1

Dated:  Brooklyn, New York
       October 15, 2024

                **PETROFF AMSHEN LLP**
                *Attorneys for Plaintiff,*
                William Antonio Reyes Maldonado a/k/a William
                Reyes Maldonado a/k/a William R. Maldonado
                a/k/a William A. Reyes a/k/a William Maldonado

                */s/ Steven Amshen*
                Steven Amshen, Esq.
                1795 Coney Island Avenue, Third Floor
                Brooklyn, New York 11230
                Telephone: (718) 336-4200
                Email: samshen@petroffamshen.com

To:

Equifax Information Services LLC
c/o Corporation Service Company
80 State Street
Albany, New York 12207-2543

Experian Information Solutions, Inc.
c/o CT Corporation System
28 Liberty Street
New York, New York 10005

Trans Union LLC a/k/a TransUnion
c/o The Prentice-Hall Corporation System, Inc.
80 State Street
Albany, New York 12207-2543

Western Alliance Bank, successor-by-merger to AmeriHome Mortgage Company, LLC
477 Madison Avenue, Fl. 17
New York, New York 10022

Union Home Mortgage Corp. d/b/a Union Home Mortgage
8241 Dow Circle W
Strongsville, Ohio 44136

Ally Financial, Inc.
c/o CT Corporation System
111 8th Street
New York, New York 10011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

| | |
|---|---|
| WILLIAM ANTONIO REYES MALDONADO a/k/a WILLIAM REYES MALDONADO a/k/a WILLIAM R. MALDONADO a/k/a WILLIAM A. REYES a/k/a WILLIAM MALDONADO, | Civil Action Index No.: |
| Plaintiff, | |
| -against- | **VERIFIED COMPLAINT** |
| EQUIFAX INFORMATION SERVICES LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION LLC a/k/a TRANSUNION; WESTERN ALLIANCE BANK, successor-by-merger to AMERIHOME MORTGAGE COMPANY, LLC; UNION HOME MORTGAGE CORP. d/b/a UNION HOME MORTGAGE; and ALLY FINANCIAL, INC., | |
| Defendants. | |

Plaintiff William Antonio Reyes Maldonado a/k/a William Reyes Maldonado a/k/a William R. Maldonado a/k/a William A. Reyes a/k/a William Maldonado ("Plaintiff"), by and through his attorneys, Petroff Amshen LLP, as and for his complaint against the defendants named herein (collectively, "Defendants"), hereby alleges the following upon personal knowledge, review of public record, and/or otherwise upon information and belief:

1.      Plaintiff brings this action for damages arising under the Fair Credit Reporting Act ("FCRA") (15 U.S.C. § 1681, *et seq.*) and its implementing Regulation V (12 C.F.R. Part 1022), and New York General Business Law ("GBL") codifying New York's Fair Credit Reporting Act (the "NYFCRA") (GBL § 374, *et seq.*), resulting from Defendants' willful and ongoing violations of consumer credit protection laws, including failure to investigate and correct inaccurate credit reporting duly disputed by Plaintiff.

1

2.      Finding that "[t]he banking system is dependent upon fair and accurate credit reporting," and "[i]naccurate credit reports directly impair the efficiency of the banking system," Congress enacted the FCRA "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information . . . ." 15 U.S.C. § 1681.

3.      Thus, because "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers," Congress determined that the protections of the FCRA were necessary "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *See id.*

4.      Relying on these protections, Plaintiff notified the Defendants of specific errors in his credit report including inaccurate and duplicative negative reporting, and omission of payment history data that would beneficially impact his credit score.

5.      Despite Defendants' "grave responsibilities" to ensure the accuracy and proper utilization of Plaintiff's credit information, Defendants failed to properly investigate or correct these errors, causing Plaintiff to suffer additional and ongoing credit damage, adverse action, and other damages.

6.      Plaintiff also seeks damages resulting from certain defendants' actions in violation of the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. § 2601, *et seq.*) and its implementing Regulation X (12 C.F.R. § 1024.1, *et seq.*), and the Equal Credit Opportunity Act ("ECOA") (15 U.S.C. § 1691, *et seq.*) and its implementing Regulation B (12 C.F.R. § 1002.1, *et seq.*).

2

Case 1:24-cv-08930-DEH-HJR   Document 1-1   Filed 11/21/24   Page 6 of 90

## PARTIES AND JURISDICTION

7.  Plaintiff is an individual and resident of the State of New York, County of Bronx, residing at 606 Beach Avenue, Apt. 2, Bronx, New York 10473.

8.  Venue in this county is proper pursuant to CPLR § 503(a), as a substantial part of the events giving rise to Plaintiff's claims occurred in this county, and Plaintiff resides in this county.

9.  Defendant Equifax Information Services LLC ("Equifax") is a limited liability company organized under the laws of the State of Georgia, with its principal place of business at 1550 Peachtree Street NW, Atlanta, Georgia 30309, and registered agent for service in New York c/o Corporation Service Company, 80 State Street, Albany, New York 12207-2543. Equifax is a wholly owned subsidiary of Equifax Inc. Equifax is one of the three national credit reporting agencies ("CRAs") recognized by the Federal Trade Commission ("FTC").

10. Defendant Experian Information Solutions, Inc. ("Experian") is a corporation organized under the laws of the State of Ohio, with its principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626, and registered agent for service in New York c/o CT Corporation System, 28 Liberty Street, New York, New York 10005. Experian is a wholly owned subsidiary of Experian Holdings, Inc. Experian is one of the three national CRAs recognized by the FTC.

11. Defendant Trans Union LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 555 West Adams Street, Chicago, Illinois 6066, and registered agent for service in New York c/o The Prentice-Hall Corporation System, Inc., 80 State Street, Albany, New York 12207-2543. The company is also

3

known as "TransUnion", and shall be referred to as such herein. TransUnion is one of the three national CRAs recognized by the FTC.[1]

12.     Defendant Western Alliance Bank ("WAB") is a state-chartered bank organized under the laws of the State of Arizona, with its principal place of business at 1 E Washington Street, Phoenix, Arizona 85004, and New York branch for service located at 477 Madison Avenue, Fl. 17, New York, New York 10022. Upon information and belief, WAB is the successor-by-merger to AmeriHome Mortgage Company, LLC ("AmeriHome"). Upon further information and belief, pursuant to a purchase agreement that closed on or about April 7, 2021, AmeriHome became a subsidiary of WAB, operating as "AmeriHome, a Western Alliance Bank company."

13.     Defendant Union Home Mortgage Corp. d/b/a Union Home Mortgage ("UHM") is a corporation organized under the laws of the State of Ohio, with its principal place of business at 8241 Dow Circle W, Strongsville, Ohio 44136. Upon information and belief, Union Home Mortgage Corp. also does business under the trade name Union Home Mortgage.

14.     Defendant Ally Financial, Inc. ("Ally") is a bank holding company incorporated in the State of Delaware, with its principal place of business at 500 Woodward Avenue, Detroit, Michigan 48226, and registered agent for service in New York c/o CT Corporation System, 111 8th Street, New York, New York 10011.[2]

**STATEMENT OF FACTS**

15.     On June 7, 2019, just months before the onset of the COVID-19 pandemic, Plaintiff and his wife, Tamara I. Vega, purchased a home in Florida located at 8167 Westmont Terrace, Lakeland, Florida 33810 (the "Florida Property"). A true and correct copy of the recorded deed

---

[1] Equifax, Experian, and TransUnion shall be referred to collectively herein as the "Defendant CRAs."
[2] WAB/AmeriHome, UHM, and Ally shall be referred to collectively herein as the "Furnisher Defendants."

4

Case 1:24-cv-08930-DEH-HJR     Document 1-1     Filed 11/21/24     Page 8 of 90

conveying title to Plaintiff and Ms. Vega, dated June 7, 2019, and recorded on July 5, 2019, is annexed hereto as **Exhibit A**.

16.     In connection with his purchase of the Florida Property, Plaintiff obtained an FHA-insured mortgage loan from UHM in the original principal amount of $235,653.00 (the "Mortgage Loan"), and executed a mortgage securing repayment of the debt dated June 7, 2019, in favor of Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for UHM (the "Mortgage").

17.     The Mortgage was recorded as a lien against the Florida Property on July 5, 2019, under Instrument No. 2019140325 (Book 10898, Pages 0831-0843).  A true and correct copy of the recorded Mortgage is annexed hereto as **Exhibit B**.

18.     In 2021, due to a COVID-19 hardship, Plaintiff was granted an FHA-HAMP modification of the Mortgage Loan (the "First Modification"), which resolved any outstanding arrears owed, and reinstated the Mortgage Loan as current.[3]

19.     In connection with the First Modification, Plaintiff executed a "Partial Claims Mortgage" dated June 8, 2021, in favor of the Secretary of Housing and Urban Development ("HUD"), securing repayment of an FHA-HAMP standalone partial claim in the amount of $16,923.11 (the "First HUD Mortgage").

20.     The First HUD Mortgage was recorded as a lien against the Florida Property on June 21, 2021, under Instrument No. 2021160539 (Book 11769, Pages 0697-0702).  A true and correct copy of the recorded First HUD Mortgage is annexed hereto as **Exhibit C**.

---

[3] *See* "FHA National Servicing Center Loss Mitigation Services" information page by the U.S. Department of Housing and Urban Development, available at: https://www.hud.gov/program_offices/housing/sfh/nsc/lossmit.

5

21.     Plaintiff's COVID-19 hardship unfortunately persisted, and in 2022, Plaintiff was granted a second FHA-HAMP modification of the Mortgage Loan (the "Second Modification"), which resolved any outstanding arrears owed, and reinstated the Mortgage Loan as current.

22.     In connection with the Second Modification, Plaintiff executed a "Partial Claim Mortgage" dated August 22, 2022, in favor of HUD, securing repayment of an FHA-HAMP standalone partial claim in the amount of $26,402.46 (the "Second HUD Mortgage").

23.     The Second HUD Mortgage was recorded as a lien against the Florida Property on September 23, 2022, under Instrument No. 2022258825 (Book 12431, Pages 0431-0435). A true and correct copy of the recorded Second HUD Mortgage is annexed hereto as **Exhibit D**.

24.     On January 16, 2024, Plaintiff and Ms. Vega sold the Florida Property for $359,900.00, an amount more than sufficient to pay off the Mortgage, the First HUD Mortgage, and the Second HUD Mortgage. A true and correct copy of the Polk County Property Appraiser's summary report of the Florida Property, reflecting the sale, is annexed hereto as **Exhibit E**; a true and correct copy of the recorded sale deed, dated January 16, 2024, and recorded on January 24, 2024, is annexed hereto as **Exhibit F**.

25.     Proceeds from the sale of the Florida Property fully satisfied all amounts due under the Mortgage, the First HUD Mortgage, and the Second HUD Mortgage.

26.     Accordingly, on January 26, 2024, UHM executed a satisfaction of mortgage (the "UHM Satisfaction"), acknowledging "full payment and satisfaction of said note and Mortgage Deed." The UHM Satisfaction was recorded on February 1, 2024, under Instrument No. 2024025058 (Book 12993, Page 0030). A true and correct copy of the recorded UHM Satisfaction is annexed hereto as **Exhibit G**.

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 10 of 90

27.     On January 31, 2024, HUD also executed releases of mortgage for the First HUD Mortgage and the Second HUD Mortgage, acknowledging "full payment and satisfaction of the same" (the "HUD Releases"). The HUD Releases were recorded on February 1, 2024, under Instrument No. 2024024770 (Book 12992, Page 1178) and Instrument No. 2024024772 (Book 12992, Page 1180), respectively. True and correct copies of the HUD Releases are annexed hereto as **Exhibit H**.

### A.     Disputed Accounts.

28.     Having satisfied his mortgage debts in full, and seeking to repair any potential damage to his credit resulting from the prolonged COVID-19 hardship, Plaintiff diligently continued tracking his credit reports, only to discover that his credit history was being misrepresented and inaccurately reported.

29.     Specifically, under "Mortgage Accounts," Plaintiff's credit report reflects two separate accounts for the Mortgage Loan (both ending -4434) – one under AmeriHome and one under UHM. Upon information and belief, on or about June 1, 2022, servicing and/or ownership of the Mortgage Loan was transferred from UHM to AmeriHome, which is a wholly-owned subsidiary of WAB.

30.     Upon further information and belief, (i) UHM and/or AmeriHome furnished inaccurate information to the Defendant CRAs regarding Plaintiff's Mortgage Loan account and the related transfer, resulting in a duplicative account being added to his credit file under AmeriHome, and conflicting data/trade lines for each account; and/or (ii) instead of updating Plaintiff's credit report to reflect the transfer on Plaintiff's existing Mortgage Loan account under UHM, the Defendant CRAs added a duplicate account to Plaintiff's credit file under AmeriHome, and reported conflicting data/trade lines for each account.

7

31.     Additionally, on or about May 30, 2013, Plaintiff obtained an auto loan through Ally.  Plaintiff paid the loan in full, and the account was marked "paid and closed" as of August 2019.

32.     Although Ally reported the loan as paid, upon information and belief, it furnished negative payment information to the Defendant CRAs, while deliberately omitting all timely payment information.  Accordingly, in the payment history for the Ally auto loan, Plaintiff's credit report reflects "no data available" other than a single "30 days past due" negative remark in November 2018.

33.     On April 12, 2024, Plaintiff sent a Notice of Dispute to each of the Defendant CRAs, advising of and disputing inaccurate items appearing on his credit report, and requesting an investigation and correction of any errors.  True and correct copies of the Notice of Dispute mailed to each of the Defendant CRAs, with proof of delivery and without enclosures, are annexed collectively hereto as **Exhibit I**.  The Notice of Dispute was confirmed delivered to each of the Defendant CRAs on April 19, 2024.  *See id.*

34.     In connection with the Notice of Dispute, Plaintiff provided all necessary information to identify the accounts and items in error, and enclosed copies of his driver's license, social security card, proof of address, and credit report dated March 21, 2024.  *See* Ex. I.

35.     Plaintiff also specified the items in dispute as follows:

a.   Inaccurate payment histories, duplicative negative reporting, and conflicting/missing data related to the AmeriHome, UHM, and Ally accounts;

b.   Numerous missing positive/on-time payment remarks; and

c.   Duplicative and conflicting trade lines for the Mortgage Loan account, appearing as separate and distinct accounts under AmeriHome and UHM.

*See* Ex. I.

36.     The payment histories for the AmeriHome, UHM, and Ally accounts appearing on Plaintiff's credit report are also missing positive/timely payment remarks for significant time periods, depriving Plaintiff of the benefit of any positive impact those remarks would have on his overall credit rating.

37.     After submitting the Notice of Dispute, Plaintiff obtained additional credit reports, which still reflect missing data and errors noted in the Notice of Dispute, and contain additional and ongoing contradictions. Notably, on the same reporting date, the Defendant CRAs each report materially conflicting information for the same accounts.

38.     Upon information and belief, to date, the Furnisher Defendants have continued furnishing incomplete, inaccurate, and contradictory information regarding Plaintiff's accounts to the Defendant CRAs; and/or the Defendant CRAs have failed to reasonably investigate the accuracy of information contained in Plaintiff's credit file, or to correct identifiable errors in Plaintiff's credit report.

## VIOLATIONS OF THE FCRA
### (15 U.S.C. § 1681, *et seq.*)

39.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

40.     Plaintiff is a "consumer" as defined by the FCRA. *See* 15 U.S.C. § 1681a(c).

41.     The Furnisher Defendants are "furnishers" of information to consumer reporting agencies, with a duty to fulfill the statutory responsibilities enumerated under 15 U.S.C. § 1681s-2, including providing accurate information relating to consumers.

42.     Each of the Furnisher Defendants is also a "person" as defined by the FCRA. *See* 15 U.S.C. § 1681a(b).

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 13 of 90

43.     Subpart E of Regulation V, the FCRA's implementing regulation, applies to furnishers of information, including the Furnisher Defendants. *See* 12 C.F.R. §§ 1022.1, 1022.40.

44.     Each of the Defendant CRAs is a "consumer reporting agency" as defined by the FCRA. *See* 15 U.S.C. § 1681a(f).

45.     Each of the Defendant CRAs individually qualifies as a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis," as defined by the FCRA. *See* 15 U.S.C. §1681a(p).

### COUNT I
**Willful Reporting of Inaccurate Information to Consumer Reporting Agencies**
**(15 U.S.C. §§ 1681s-2, 1681n)**
*AS TO THE FURNISHER DEFENDANTS*

46.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

47.     The FCRA prohibits furnishers from reporting information to a CRA "with actual knowledge of errors" and "after notice and confirmation of errors." *See* 15 U.S.C. § 1681s-2(a)(1).

48.     Specifically, "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." *See* 15 U.S.C. § 1681s-2(a)(1)(A).   "The term 'reasonable cause to believe that the information is inaccurate' means having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information." 15 U.S.C. § 1681s-2(a)(1)(D).

49.     Additionally, "[a] person shall not furnish information relating to a consumer to any consumer reporting agency if -- (i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and (ii) the information is, in fact, inaccurate." *See* 15 U.S.C. § 1681s-2(a)(1)(B).

Case 1:24-cv-08930-DEH-HJR Document 1-1 Filed 11/21/24 Page 14 of 90

50. Upon receipt of notice of a dispute regarding the completeness or accuracy of information provided to a CRA under 15 U.S.C. § 1681i(a)(2), a furnisher of the disputed information must conduct a timely investigation and correct and discontinue any inaccurate reporting. *See* 15 U.S.C. § 1681s-2(b).

51. Regulation V provides that "[e]ach furnisher must establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information relating to consumers that it furnishes to a consumer reporting agency," and "review its policies and procedures required by this section periodically and update them as necessary to ensure their continued effectiveness." *See* 12 C.F.R. § 1022.42.

52. Regulation V defines "accuracy" as:

> [I]nformation that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer [that] correctly: (1) [r]eflects the terms of and liability for the account or other relationship; (2) [r]eflects the consumer's performance and other conduct with respect to the account or other relationship; and (3) [i]dentifies the appropriate consumer.

12 C.F.R. § 1022.41(a).

53. The Furnisher Defendants reported inaccurate account information regarding Plaintiff's accounts to the Defendant CRAs, which was incorporated into Plaintiff's credit file and credit reports issued by the Defendant CRAs.

54. The inaccurate information included: (i) duplicative and contradictory account data; (ii) duplicative negative reporting; (iii) inaccurate and conflicting payment histories; and (iv) missing data including positive/timely payment remarks.

55. Upon information and belief, the Furnisher Defendants each received notice of Plaintiff's Notice of Dispute regarding the accuracy of his account information as reported to the Defendant CRAs.

56.    The Furnisher Defendants failed to review information provided by Plaintiff in connection with the Notice of Dispute, and failed to contact Plaintiff for any additional information.

57.    The Furnisher Defendants also deliberately failed and refused to conduct a proper or timely investigation of Plaintiff's dispute, or to correct the disputed information, and have continued inaccurately reporting information to the Defendant CRAs regarding Plaintiff's accounts in violation of 15 U.S.C. § 1681s-2.

58.    The Furnisher Defendants' deliberate and ongoing furnishing of incomplete, inaccurate, and contradictory information regarding Plaintiff's accounts has caused Plaintiff to suffer damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

59.    As a result of the Furnisher Defendants' willful conduct in violation of the FCRA, Plaintiff has been damaged and is entitled to actual, statutory, and punitive damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681n.

## COUNT II
**Negligent Reporting of Inaccurate Information to Consumer Reporting Agencies**
**(15 U.S.C. §§ 1681s-2, 1681o)**
*AS TO THE FURNISHER DEFENDANTS*

60.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

61.    Upon information and belief, after receiving notice of Plaintiff's dispute regarding the accuracy of his account information as reported by the Defendant CRAs, the Furnisher Defendants thereafter negligently failed and refused to conduct any required investigation or to

correct the disputed information, and have continued inaccurately furnishing information to the Defendant CRAs regarding Plaintiff's accounts, in violation of 15 U.S.C. § 1681s-2.

62. Accordingly, the Defendant CRAs have continued producing credit reports for Plaintiff containing inaccurate and damaging credit information.

63. The Furnisher Defendants' deliberate and ongoing furnishing of incomplete, inaccurate, and contradictory information regarding Plaintiff's accounts has caused Plaintiff to suffer damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages

64. As a result of the Furnisher Defendants' negligent conduct in violation of the FCRA, Plaintiff is entitled to actual and statutory damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681o.

## COUNT III
### Willful Failure to Assure Accuracy of Consumer Information in Credit Report
### (15 U.S.C. §§ 1681e(b), 1681n)
### *AS TO THE DEFENDANT CRAS*

65. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

66. "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

67. The Defendant CRAs each received Plaintiff's Notice of Dispute demonstrating that Plaintiff's credit report contained inaccurate information.

13

68.     Despite receipt of the foregoing, the Defendant CRAs deliberately failed and refused to undertake a reasonable investigation to ensure the accuracy of reported information concerning Plaintiff's accounts.

69.     Although the information Plaintiff provided should have been sufficient to verify that the disputed information in Plaintiff's credit report was inaccurate, the Defendant CRAs failed and refused to properly review it, and further failed and refused to contact Plaintiff or the Furnisher Defendants for any additional information that would assist in a reasonable investigation.

70.     Accordingly, the Defendant CRAs continued producing credit reports for Plaintiff containing inaccurate and damaging credit information, causing Plaintiff to suffer damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

71.     The Defendant CRAs' failure to follow reasonable procedures to assure maximum possible accuracy of the information in their reports was malicious, intentional, reckless, and willful.

72.     As a result of the Defendant CRAs' willful conduct in violation of the FCRA, Plaintiff has been damaged and is entitled to actual, statutory, and punitive damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681n.

**COUNT IV**
**Negligent Failure to Assure Accuracy of Consumer Information in Credit Report**
**(15 U.S.C. §§ 1681e(b), 1681o)**
***AS TO THE DEFENDANT CRAS***

73.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

14

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 18 of 90

74.     Despite receipt of evidence that Plaintiff's credit report contained inaccurate information, the Defendant CRAs failed to establish and follow reasonable procedures to promptly investigate and ensure the accuracy of reported information concerning Plaintiff's accounts.

75.     Accordingly, the Defendant CRAs continued producing credit reports for Plaintiff containing inaccurate and damaging credit information, causing Plaintiff to suffer damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

76.     As a result of the Defendant CRAs' negligent conduct in violation of the FCRA, Plaintiff is entitled to actual and statutory damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681o.

## COUNT V
**Willful Failure to Assure Accuracy of Consumer Information in Credit File**
**(15 U.S.C. §§ 1681i, 1681n)**
***AS TO THE DEFENDANT CRAS***

77.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

78.     "[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . ." 15 U.S.C. § 1681i(a)(1)(A).

79.     This investigation must be completed within thirty (30) days of the CRA's receipt of notice of the dispute.  *See id.*

15

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 19 of 90

80. The CRA must also provide notice of the dispute to any furnisher of the disputed information, within five (5) business days of receipt.

81. "In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information." 15 U.S.C. § 1681i(a)(4).

82. Within five (5) business days of completing a reinvestigation, a CRA must provide the consumer with written notice of the results and additional statutory notices.

83. Upon receipt of Plaintiff's Notice of Dispute, the Defendant CRAs deliberately failed and refused to undertake the required reinvestigation of Plaintiff's credit file, or to ensure the accuracy of reported information concerning Plaintiff's accounts.

84. Although the information Plaintiff provided should have been sufficient to verify that the disputed information in Plaintiff's credit file was inaccurate, the Defendant CRAs failed and refused to properly review it, and further failed and refused to contact Plaintiff for any additional information that would assist in a reasonable investigation.

85. Upon information and belief, the Defendant CRAs deliberately failed to provide notice of Plaintiff's disputes to the furnishers of the disputed information, as required under 15 U.S.C. § 1681i(a)(2).

86. Upon information and belief, the Defendant CRAs also failed to provide Plaintiff with written notice of the results of the investigation, or any of the additional required statutory notices, in violation of 15 U.S.C. § 1681i.

87. The Defendant CRAs further failed to correct inaccurate and damaging credit information contained in Plaintiff's credit file, causing Plaintiff to suffer damages including loss

and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

88.    The Defendant CRAs' failure to follow reasonable procedures to assure maximum possible accuracy of the information in their credit files was malicious, intentional, reckless, and willful.

89.    As a result of the Defendant CRAs' willful conduct in violation of the FCRA, Plaintiff has been damaged and is entitled to actual, statutory, and punitive damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681n.

### COUNT VI
**Negligent Failure to Assure Accuracy of Consumer Information in Credit File**
**(15 U.S.C. §§ 1681i, 1681o)**
*AS TO THE DEFENDANT CRAS*

90.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

91.    Upon receipt of Plaintiff's Notice of Dispute, the Defendant CRAs had a duty to undertake the required reinvestigation of Plaintiff's credit file, and to ensure the accuracy of reported information concerning Plaintiff's accounts.

92.    The Defendant CRAs failed to provide notice of Plaintiff's disputes to the furnishers of the disputed information, as required under 15 U.S.C. § 1681i(a)(2).

93.    The Defendant CRAs failed to investigate Plaintiff's dispute or to properly consider the information Plaintiff submitted in connection with the dispute, and further failed and refused to contact Plaintiff, or the furnishers of the disputed information, for any additional information that would assist in a reasonable investigation.

17

94.     The Defendant CRAs further failed to correct inaccurate and damaging credit information contained in Plaintiff's credit file, or to provide Plaintiff with written notice of the results and additional required statutory notices, in violation of 15 U.S.C. § 1681i.

95.     This caused Plaintiff to suffer damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

96.     As a result of the Defendant CRAs' negligent conduct in violation of the FCRA, Plaintiff is entitled to actual and statutory damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681o.

## VIOLATIONS OF N.Y. GENERAL BUSINESS LAW

97.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

98.     Sections 374 through 382-b of Article 25 of the New York General Business Law codify New York's Fair Credit Reporting Act.

99.     Plaintiff is a "consumer" within the meaning of the NYFCRA.  *See* GBL § 380-a(b).

100.    Each of the Furnisher Defendants is a "person" within the meaning of the NYFCRA.  *See* GBL § 380-a(a).

101.    Each of the Defendant CRAs is a "consumer reporting agency" within the meaning of the NYFCRA.  *See* GBL § 380-a(e).

18

## COUNT VII
### Willful Reporting of Inaccurate Information to Consumer Reporting Agencies
### (N.Y. Gen. Bus. Law § 380-o)
### *AS TO THE FURNISHER DEFENDANTS*

102.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

103.     The NYFCRA prohibits the knowing and willful introduction, or attempt to introduce, false information into a consumer reporting agency's files. *See* GBL § 380-o(2). Persons who violate Section 380-o are subject to fines of up to $5,000.00, imprisonment, or both. *See id.*

104.     As a result of the Furnisher Defendants' knowing and willful introduction of false information regarding Plaintiff's account into the files of the consumer credit bureaus, the Furnisher Defendants have violated the NYFCRA and are liable to Plaintiff in an amount up to $5,000.00, to be determined by the Court.

105.     The Furnisher Defendants are further liable to Plaintiff pursuant to GBL § 380-l, for actual damages, punitive damages, and attorneys' fees and costs incurred in connection with this action, in an amount to be determined by the Court.

## COUNT VIII
### Failure to Investigate and Resolve Consumer Dispute
### (N.Y. Gen. Bus. Law §§ 380-f, 380-m)
### *AS TO THE DEFENDANT CRAS*

106.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

107.     Pursuant to GBL § 380-f(a):

> If a consumer disputes any item of information contained in his file, and such dispute is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall promptly re-investigate and record the current status of such information, unless it has reasonable grounds to believe that the dispute by the consumer is frivolous, and it shall promptly notify the consumer of

the result of its investigation, its decision on the status of the information and his rights pursuant to this section.

108.    If, after conducting the re-investigation, the CRA can no longer verify an item, or confirms an error, the CRA must, among other things: (i) "promptly expunge the item and otherwise correct the file"; (ii) "refrain from reporting the item in subsequent consumer reports"; and (iii) "clearly and conspicuously disclose to the consumer his rights to make a request for notification." *See* GBL § 380-f(b).

109.    Further, "if any item disputed and reinvestigated is found to be in error or can no longer be verified, upon completion of the reinvestigation of all items disputed, the [CRA] shall promptly mail the consumer a corrected written copy of the file, reflecting any changes, with an explanation of any code used, at no charge to the consumer." GBL § 380-f(d).

110.    Upon receipt of Plaintiff's Notice of Dispute, the Defendant CRAs were obligated to investigate Plaintiff's claims, notify Plaintiff of the results of the investigation, and fulfill any additional requirements of GBL § 380-f.

111.    The Defendant CRAs failed to undertake any investigation of Plaintiff's dispute, or to review any information provided in connection with the dispute, and likewise failed to revise or correct the inaccurate information contained in Plaintiff's credit file.

112.    The Defendant CRAs further failed to notify Plaintiff of the results of their investigation, as no such investigation ever took place.

113.    As a result, Plaintiff has suffered damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

114.    Accordingly, Plaintiff is entitled to recover actual damages, together with reasonable attorneys' fees and costs pursuant to GBL § 380-m.

115.    The Defendant CRAs are further liable to Plaintiff pursuant to GBL § 380-l, for actual damages, punitive damages, and attorneys' fees and costs incurred in connection with this action, in an amount to be determined by the Court.

### VIOLATIONS OF RESPA AND REGULATION X
#### (12 U.S.C. § 2601, *et seq.* and 12 C.F.R. § 1024.1, *et seq.*)
#### AS TO WAB AND UHM

116.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

117.    RESPA (12 U.S.C. § 2601, *et seq.*) is a federal consumer protection statute which, along with its implementing regulations, imposes certain duties on lenders and servicers related to the real estate settlement process and servicing of mortgage loans, and provides a framework for borrowers to remedy servicing and account errors.

118.    RESPA expressly authorizes the Bureau of Consumer Financial Protection ("CFPB") "to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter." *See* 12 U.S.C. § 2617(a).  Regulation X (12 C.F.R. § 1024.1, *et seq.*), issued by the CFPB pursuant Section 2617(a), is RESPA's implementing regulation.

119.    RESPA prohibits loan servicers from failing to comply with CFPB regulations intended to carry out RESPA's consumer protection purposes, including Regulation X.  *See* 12 U.S.C. § 2605(k)(1)(E).

120.    RESPA further prohibits servicers from "fail[ing] to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 25 of 90

purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." *See* 12 U.S.C. § 2605(k)(1)(C).

121. Regulation X, among other things, details "[e]rror resolution procedures" servicers must follow upon receipt of a written notice from the borrower asserting an error. *See* 12 C.F.R. § 1024.35. Section 1024.35(b) lists eleven categories of "covered errors" under Regulation X including, among others, failure to properly accept and apply payments, and failure to accurately credit payments on the date received. *See* 12 C.F.R. § 1024.35(b). Section 1024.35 also contains a "catch-all provision" covering "[a]ny other error relating to the servicing of a borrower's mortgage loan." *See* 12 C.F.R. § 1024.35(b)(11).

122. Regulation X also outlines "[g]eneral servicing policies, procedures, and requirements" for servicers, which include maintaining policies and procedures "reasonably designed to ensure that the servicer can . . . [i]nvestigate, respond to, and, as appropriate, make corrections in response to complaints asserted by a borrower." *See* 12 C.F.R. § 1024.38(b).

123. Upon information and belief, from on or about June 7, 2019, to on or about May 31, 2022, UHM was the "servicer" of Plaintiff's Mortgage Loan, as defined by RESPA and Regulation X. *See* 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2.

124. Upon information and belief, beginning on or about June 1, 2022, WAB's subsidiary, AmeriHome, became the "servicer" of Plaintiff's Mortgage Loan, as defined by RESPA and Regulation X. *See* 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2.

## COUNT IX
### Failure to Investigate or Accurately Respond to Notice of Error
### (12 U.S.C. § 2605(e) and 12 C.F.R. §§ 1024.35, 1024.36)

125. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

126.    Pursuant to 12 U.S.C. § 2605(e), loan servicers have a duty to respond to inquiries received from a borrower or his agent, meeting the criteria of a qualified written request ("QWR").

127.    A QWR is defined as "written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

128.    RESPA requires a servicer, within thirty (30) days of receipt of a QWR from a borrower or his agent, to (i) conduct an investigation, (ii) make any necessary corrections to the borrower's account and provide written notice of any such corrections, and (iii) provide a written explanation regarding the errors detailed in the QWR, and any additional information requested by the borrower. *See* 12 U.S.C. § 2605(e)(2).

129.    Regulation X also details specific actions a loan servicer must take upon receipt of a notice of error or request for information, including acknowledging receipt, conducting an investigation, correcting any errors identified by the borrower or otherwise discovered during the investigation, and providing the borrower with a written response and explanation. *See* 12 C.F.R. §§ 1024.35, 1024.36.

130.    For purposes of Regulation X, "[a] qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request." *See* 12 C.F.R. § 1024.35(a).

23

131.    The furnishing of inaccurate payment information concerning Plaintiff's Mortgage Loan account is an "error relating to the servicing of a borrower's mortgage loan." *See* 12 C.F.R. § 1024.35(b)(11).

132.    Upon information and belief, WAB and UHM received Plaintiff's Notice of Dispute, which asserted servicing errors including AmeriHome and UHM furnishing inaccurate account and payment information to the Defendant CRAs.

133.    Accordingly, Plaintiff's Notice of Dispute is a notice of error for purposes of RESPA and Regulation X.

134.    Upon information and belief, upon receipt of Plaintiff's Notice of Dispute, WAB and UHM failed to acknowledge receipt, conduct an investigation, or correct the errors Plaintiff identified.

135.    WAB and UHM further failed to provide Plaintiff with a written response or explanation, and continued furnishing inaccurate and contradictory account and payment information to the Defendant CRAs.

136.    As a result of these actions in violation of 12 U.S.C. § 2605(e), Plaintiff has suffered damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

137.    Accordingly, Plaintiff is entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1), along with any attorneys' fees and costs incurred in connection with this action pursuant to 12 U.S.C. § 2605(f)(3).

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 28 of 90

## COUNT X
**Failure to Take Timely Action to Respond to a Borrower's Request to Correct Errors
(12 U.S.C. § 2605(k)(1)(C) and 12 C.F.R. § 1024.35)**

138. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

139. Plaintiff's Notice of Dispute asserted servicing errors including AmeriHome and UHM furnishing inaccurate account and payment information to the Defendant CRAs, and requested correction of these errors.

140. RESPA prohibits a servicer from "fail[ing] to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." *See* 12 U.S.C. § 2605(k)(1)(C).

141. Upon information and belief, WAB and UHM received Plaintiff's Notice of Dispute, but failed and refused to acknowledge or correct these errors, in violation of 12 C.F.R. § 1024.35, and 12 U.S.C. §§ 2605(k)(1)(C) and 2605(k)(1)(E).

142. As a result of these actions, Plaintiff has suffered damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

143. Accordingly, Plaintiff is entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1), along with any attorneys' fees and costs incurred in connection with this action pursuant to 12 U.S.C. § 2605(f)(3).

### COUNT XI
**Improperly Furnishing Adverse Information to a Consumer Reporting Agency
(12 U.S.C. §§ 2605(e)(3), 2605(k)(1)(E) and 12 C.F.R. § 1024.35(i)(1))**

144.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

145.    Upon receipt of a QWR relating to a payment dispute, RESPA provides that "a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency," for a 60-day period.  *See* 12 U.S.C. § 2605(e)(3).

146.    Regulation X likewise prohibits adverse credit reporting within 60 days of receipt of a notice of error.  *See* 12 C.F.R. § 1024.35(i)(1) ("After receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error.").

147.    Upon information and belief, WAB and UHM received Plaintiff's Notice of Dispute regarding the furnishing of inaccurate and duplicative negative payment history data concerning his Mortgage Loan account.

148.    Despite receipt of the Notice of Dispute, upon information and belief, WAB and UHM continued furnishing inaccurate and contradictory payment history data to the Defendant CRAs within the 60-day prohibition period, and relating to the disputed payment period, in violation of 12 U.S.C. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

149.    As a result of these actions, Plaintiff has suffered damages including loss and reduction of credit, increased debt, and higher interest rates and unfavorable terms on any available credit options, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

150.     Accordingly, Plaintiff is entitled to recover actual damages pursuant to 12 U.S.C.

§ 2605(f)(1), along with any attorneys' fees and costs incurred in connection with this action

pursuant to 12 U.S.C. § 2605(f)(3).

### VIOLATIONS OF ECOA AND REGULATION B
#### (15 U.S.C. § 1691, *et seq.* and 12 C.F.R. § 1002.1, *et seq.*)
##### AS TO ALLY

151.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully

set forth herein.

152.     Congress enacted ECOA to "insure that the various financial institutions and other

firms engaged in the extensions of credit exercise their responsibility to make credit available with

fairness, impartiality, and without discrimination."  *See* PL 93–495 (HR 11221), PL 93–495, Oct.

28, 1974, 88 Stat 1500.

153.     Regulation B (12 C.F.R. § 1002.1, *et seq.*), issued by the Bureau of Consumer

Financial Protection ("CFPB"), is ECOA's implementing regulation granting the CFPB authority

to prescribe regulations to carry out ECOA's purposes.  *See* 15 U.S.C. § 1691b.

154.     The purpose of Regulation B is "to promote the availability of credit to all

creditworthy applicants without regard to race, color, religion, national origin, sex, marital status,

or age," and to "prohibit[] creditor practices that discriminate on the basis of any of these factors."

*See* 12 C.F.R. § 1002.1(b).

155.     Ally is a "creditor" as defined by ECOA and Regulation B.  *See* 15 U.S.C. §

1691a(e); 12 C.F.R. § 1002.2(l).

156.     An "applicant" is "any person who requests or who has received an extension of

credit from a creditor, and includes any person who is or may become contractually liable

regarding an extension of credit."  12 C.F.R. § 1002.2(e).

157.   Accordingly, with respect to the auto loan with Ally appearing on Plaintiff's credit report, Plaintiff is an "applicant" for purposes of ECOA and Regulation B.

## COUNT XII
### Discrimination with Respect to a Consumer Credit Transaction
### (15 U.S.C. § 1691 and 12 C.F.R. §§ 1002.4, 1002.6)

158.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

159.   ECOA prohibits a creditor from discriminating against the applicant of a credit transaction "on the basis of race, color, religion, national origin, sex or marital status, or age." *See* 15 U.S.C. § 1691(a)(1).

160.   Regulation B further "prohibits creditor practices that discriminate on the basis of any of these factors." *See* 12 C.F.R. § 1002.1(b).

161.   Plaintiff applied for and received an auto loan from Ally, which originated on or about May 30, 2013.

162.   Plaintiff identifies as Hispanic.

163.   Upon information and belief, Ally employed a discriminatory pricing system in connection with Plaintiff's auto loan, resulting in Plaintiff receiving a higher interest rate or "dealer markup" due to his race/national origin.

164.   In addition to employing discriminatory pricing in connection with Plaintiff's auto loan due to his race/national origin, Ally also employed similar discriminatory practices in the furnishing of information regarding the loan to the Defendant CRAs.

165.   Specifically, although Ally reported that Plaintiff paid the loan in full and closed the account as of August 2019, Ally still furnished a negative payment remark for November 2018, while also wholly omitting all positive, timely payment remarks for the entirety of the loan term.

166.    Upon further information and belief, Ally's policies and practices related to its pricing system and furnishing of account information are not justified by a legitimate business need, and constitute discrimination against applicants, including Plaintiff, on the basis of race and national origin in violation of 15 U.S.C. § 1691(a)(1) and 12 C.F.R. §§ 1002.4(a), 1002.6(a), and 1002.6(b)(9).

167.    Notably, in 2013, the CFPB and Department of Justice ("DOJ") ordered Ally to pay $80 million in damages, and $18 million in penalties, after determining that "more than 235,000 minority borrowers paid higher interest rates for their auto loans between April 2011 and December 2013 because of Ally's discriminatory pricing system." *See* CFPB Press Release dated December 20, 2013, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-doj-order-ally-to-pay-80-million-to-consumers-harmed-by-discriminatory-auto-loan-pricing/.

168.    "The CFPB and DOJ's coordinated investigation concluded that Ally violated the ECOA by charging African-American, Hispanic, and Asian and Pacific Islander borrowers higher dealer markups for their auto loans than similarly-situated non-Hispanic white borrowers." *Id.*

169.    Ally's settlement with the CFPB and DOJ "represent[ed] the federal government's largest auto loan discrimination settlement in history." *See id.*

170.    As a result of Ally's discriminatory conduct against Plaintiff in violation of ECOA, Plaintiff has incurred damages including loss and reduction of credit, increased debt, higher interest rates and unfavorable loan terms, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

171.    Accordingly, Plaintiff is entitled to actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1691e(a) and (b), along with any attorneys' fees and costs incurred in connection with this action pursuant to 15 U.S.C. § 1691e(d).

**COUNT XIII**
**Deceptive Acts and Practices**
**(N.Y. Gen. Bus. Law § 349)**
**AS TO ALLY**

172.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

173.    New York law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  GBL § 349.

174.    "To maintain a cause of action under § 349, a plaintiff must show: (1) that the defendant's conduct is 'consumer-oriented'; (2) that the defendant is engaged in a 'deceptive act or practice'; and (3) that the plaintiff was injured by this practice."  *See Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).

175.    "The 'consumer-oriented' requirement may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers.'"  *Id.*

176.    Ally engaged in deceptive acts and practices by employing discriminatory pricing and compensation structures that gave auto dealers "the ability and incentive to mark up interest rates" for African-American, Hispanic, and Asian and Pacific Islander borrowers, resulting in "higher dealer markups for their auto loans than similarly-situated non-Hispanic white borrowers." *See* CFPB Press Release dated December 20, 2013, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-doj-order-ally-to-pay-80-million-to-consumers-harmed-by-discriminatory-auto-loan-pricing/.

177.    "Ally's discriminatory pricing and compensation structure injured more than 235,000 minority borrowers from April 2011 through December 2013." *Id.*  Additionally, "Ally is one of the largest indirect auto lenders in the United States." *Id.*

30

Case 1:24-cv-08930-DEH-HJR   Document 1-1   Filed 11/21/24   Page 34 of 90

178.    Upon information and belief, Plaintiff received a discriminatory pricing markup on his auto loan with Ally, during the relevant time period investigated by the CFPB and DOJ.

179.    Upon further information and belief, Ally employed the same discriminatory practices in furnishing account history data and other information to the Defendant CRAs, which unfairly damaged Plaintiff's credit rating.

180.    As a result of Ally's deceptive acts and practices including discriminatory loan pricing incentives and discriminatory furnishing of account information to credit bureaus, Plaintiff has incurred damages including loss and reduction of credit, increased debt, higher interest rates and unfavorable loan terms, payment of attorneys' fees and other costs to retain professionals to assist with credit recovery, and other actual damages.

181.    Given Ally's status as "one of the largest indirect auto lenders in the United States," and its proven discriminatory practices already injuring more than 235,000 minority borrowers, these deceptive acts and practices have impacted and will impact not only Plaintiff, but will also have a broader impact on consumers at large.

182.    Accordingly, pursuant to GBL § 349(h), Plaintiff is entitled to recover (i) actual damages or fifty dollars, whichever is greater; or, in the Court's discretion, an amount not to exceed three times the actual damages, up to one thousand dollars; and (ii) reasonable attorneys' fees incurred in bringing this action.

## DEMAND FOR JURY TRIAL

183.    Plaintiff respectfully requests a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully demands judgment awarding all actual, statutory, and/or punitive damages and other relief available pursuant to applicable law, including:

(a) actual, statutory, and punitive damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681n;

31

(b) actual and statutory damages, and recovery of attorneys' fees and costs incurred in connection with this action, pursuant to 15 U.S.C. § 1681o;

(c) actual, statutory, and punitive damages, and attorneys' fees and costs incurred in connection with this action, pursuant to GBL § 380-l;

(d) actual, statutory, and punitive damages, and recovery of attorneys' fees and costs incurred in connection with this action pursuant to GBL § 380-l;

(e) actual damages and recovery of attorneys' fees and costs incurred in connection with this action pursuant to GBL § 380-m;

(f) actual damages pursuant to 12 U.S.C. § 2605(f)(1), and recovery of attorneys' fees and costs incurred in connection with this action pursuant to 12 U.S.C. § 2605(f)(3);

(g) actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1691e(a) and (b), and recovery of attorneys' fees and costs incurred in connection with this action pursuant to 15 U.S.C. § 1691e(d);

(h) pursuant to GBL § 349(h), (i) actual damages or fifty dollars, whichever is greater; or, in the Court's discretion, an amount not to exceed three times the actual damages, up to one thousand dollars; and (ii) reasonable attorneys' fees incurred in bringing this action; and

(i) such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
October 15, 2024

**PETROFF AMSHEN LLP**
*Attorneys for Plaintiff,*
William Antonio Reyes Maldonado a/k/a William
Reyes Maldonado a/k/a William R. Maldonado
a/k/a William A. Reyes a/k/a William Maldonado

*/s/ Steven Amshen*
Steven Amshen, Esq.
1795 Coney Island Avenue, Third Floor
Brooklyn, New York 11230
Telephone: (718) 336-4200
Email: samshen@petroffamshen.com

32

*Maldonado v. Equifax Information Services LLC, et al.*

## SUMMARY OF EXHIBITS

**Exhibit A** – Deed dated June 7, 2019

**Exhibit B** – Mortgage dated June 7, 2019

**Exhibit C** – Partial Claims Mortgage dated June 8, 2021

**Exhibit D** – Partial Claim Mortgage dated August 22, 2022

**Exhibit E** – Polk County Property Appraiser's Report

**Exhibit F** – Deed dated January 16, 2024

**Exhibit G** – Satisfaction of Mortgage dated January 26, 2024

**Exhibit H** – Releases of Mortgage dated January 31, 2024

**Exhibit I** – Notice of Dispute dated April 12, 2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

WILLIAM ANTONIO REYES MALDONADO a/k/a
WILLIAM REYES MALDONADO a/k/a WILLIAM
R. MALDONADO a/k/a WILLIAM A. REYES a/k/a
WILLIAM MALDONADO,

                            Plaintiff,

-against-

EQUIFAX INFORMATION SERVICES LLC;
EXPERIAN INFORMATION SOLUTIONS, INC.;
TRANS UNION LLC a/k/a TRANSUNION;
WESTERN ALLIANCE BANK, successor-by-merger
to AMERIHOME MORTGAGE COMPANY, LLC;
UNION HOME MORTGAGE CORP. d/b/a UNION
HOME MORTGAGE; and ALLY FINANCIAL, INC.,

                            Defendants.

Civil Action
Index No.:

**INDIVIDUAL VERIFICATION**

STATE OF NEW YORK     )
                         ) ss:
COUNTY OF _Nassau_   )

    William Antonio Reyes Maldonado a/k/a William Reyes Maldonado a/k/a William R. Maldonado a/k/a William A. Reyes a/k/a William Maldonado, being of full age and duly sworn, deposes and says:

    I am the Plaintiff in this action. I have read the foregoing Verified Complaint and confirm that the contents thereof are true to the best of my knowledge, except as to those matters alleged upon information and belief and as to those matters, I believe them to be true.

                                      William Antonio Reyes Maldonado

On the 14 of October in the year 2024, before me, the undersigned, a Notary Public in and for said State, personally appeared William Antonio Reyes Maldonado, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he executed same in his capacity, and that by his signature on the instrument, the individual or the person or entity upon behalf of which the individual acted, executed the instrument.

                                      Notary Public

JARED SEO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01SE6444526
Qualified in Nassau County
Commission Expires 11/28/2026

CamScanner

# EXHIBIT A

INSTR # 2019140324
BK 10898 Pgs 0829-0830 PG(s)2
07/05/2019 11:56:27 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 18.50
DEED DOC 1,680.00

Prepared by and return to:
Deborah Winter
Easy Title Company, LLC
120 East Pine Street
Suite 5
Lakeland, FL 33801
(863) 624-3279
File No 2019-420

Parcel Identification No 102723-000827-001260

_____    _____    [Space Above This Line For Recording Data]

# WARRANTY DEED
### (STATUTORY FORM – SECTION 689.02, F.S.)

**This indenture** made the **7th day of June, 2019** between **Paula Papp, individually and as Trustee(s) of the Paula Papp Trust dated September 6, 2018**, whose post office address is **9431 Redhawk Bend Lane, Lakeland, FL 33810**, of the County of Polk, State of Florida, Grantor, to **William A. Reyes Maldonado and Tamara I. Vega, husband and wife**, whose post office address is **8167 Westmont Terrace, Lakeland, FL 33810**, of the County of Polk, State of Florida, Grantees:

**Witnesseth**, that said Grantor, for and in consideration of the sum of TEN DOLLARS (U.S.$10.00) and other good and valuable considerations to said Grantor in hand paid by said Grantees, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said Grantees, and Grantees' heirs and assigns forever, the following described land, situate, lying and being in Polk, Florida, to-wit:

Lot 126, Copper Ridge Terrace, according to the map or plat thereof, as recorded in Plat Book 126, Page(s) 1 and 2, of the Public Records of Polk County, Florida.

**Together with** all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**Subject to** taxes for 2019 and subsequent years, not yet due and payable; covenants, restrictions, easements, reservations and limitations of record, if any.

**TO HAVE AND TO HOLD** the same in fee simple forever.

**And** Grantor hereby covenant with the Grantees that the Grantor is lawfully seized of said land in fee simple, that Grantor have good right and lawful authority to sell and convey said land and that the Grantor hereby fully warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever.

**In Witness Whereof,** Grantor have hereunto set Grantor's hand and seal the day and year first above written.

*Signed, sealed and delivered in our presence:*

WITNESS

**DEBORAH JO WINTER**
PRINTED NAME

WITNESS

Kosy Steiner
PRINTED NAME

Paula Papp Trust

By: _____
Paula Papp, individually and as Trustee(s) of the Paula Papp
Trust dated September 6, 2018

STATE OF FLORIDA
COUNTY OF POLK

The foregoing instrument was acknowledged before me this ___7___ day of June, 2019, by Paula Papp, individually and as Trustee of Paula Papp Trust dated September 6, 2018.

_____
Signature of Notary Public
Print, Type/Stamp Name of Notary

DEBORAH WINTER
MY COMMISSION # GG 136101
EXPIRES: August 20, 2021
Bonded Thru Notary Public Underwriters

Personally Known:_____ OR Produced Identification:_____
Type of Identification
Produced:_____

Stacy M. Butterfield POLK
CFN# 2019140324 OR BK 10898  PG 830 Pgs 0829-0830 07/05/2019 11:56:27 AM

# EXHIBIT B

INSTR # 2019140325
BK 10898 Pgs 0831-0843 PG(s)13
07/05/2019 11:56:27 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 112.00
MTG DOC 824.95
INTANGIBLE 471.31

When recorded, return to:
Union Home Mortgage Corp.
Attn: Final Document Department
8241 Dow Circle W
Strongsville, OH 44136

This document was prepared by:
Union Home Mortgage Corp.
8241 Dow Circle W
Strongsville, OH 44136
440-234-4300

Escrow No.: 2019-420
LOAN #: ▓▓▓▓

——— [Space Above This Line for Recording Data] ———

**MORTGAGE**

FHA Case No.

MIN: **1000745-0000594104-0**

**MERS PHONE #: 1-888-679-6377**

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 15.
(A) "Security Instrument" means this document, which is dated **June 7, 2019,**    together with all Riders to this document.
(B) "Borrower" is **WILLIAM A REYES MALDONADO AND TAMARA I. VEGA, HUSBAND AND WIFE.**

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is **Union Home Mortgage Corp..**

Lender is **a Corporation,**    organized and existing
under the laws of **Ohio.**
Lender's address is **8241 Dow Circle W, Strongsville, OH 44136**

(E) "Note" means the promissory note signed by Borrower and dated **June 7, 2019.**    The Note states that Borrower owes Lender **TWO HUNDRED THIRTY FIVE THOUSAND SIX HUNDRED FIFTY THREE AND NO/100* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *** Dollars (U.S. **$235,653.00**    )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 1, 2049.**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:
☐ Adjustable Rate Rider    ☐ Condominium Rider    ☒ Planned Unit Development Rider
☐ Other(s) [specify]

**FLORIDA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.    Page 1 of 10    Initials: ▓▓▓▓▓
FLEFHA15DE 0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

T.V.

**LOAN #:**

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.
(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the **County**            of **Polk**
                    [Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]:
**See attached legal description**
**APN #: 23-17-10-000827-001260**

which currently has the address of  **8167 Westmont Terrace Drive, Lakeland,**

[Street] [City]

Florida **33810-2083**          ("Property Address"):
         [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

FLORIDA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 2 of 10

Initials: _____

FLEFHA15DE  0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898 PG 832 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

FLORIDA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**      Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                      Page 3 of 10

Initials: W. ARM.          T.V.

FLEFHA15DE  0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST



Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898 PG 833 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 24 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.    Page 4 of 10    Initials: _____

Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898 PG 834 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing

Initials: _WARM_

FLEFHA15DE 0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

T.V.

Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898 PG 835 Pgs 0831-0843 07/05/2019 11:56:27 AM

FILED: BRONX COUNTY CLERK 10/14/2024 08:38 PM INDEX NO. 816499/2024E

NYSCEF DOC. NO. 3    Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    RECEIVED NYSCEF: 10/14/2024    Page 47 of 90

LOAN #:

Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests

T.V.

FLORIDA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.    Page 6 of 10    Initials: _____

FLEFHA15DE  0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

Stacy M. Butterfield  POLK
CFN# 2019140325 OR BK 10898  PG 836 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**22. Grounds for Acceleration of Debt.**

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

FLORIDA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                                      Page 7 of 10

Initials: **WANU**    **T.V.**

FLEFHA15DE  0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

Stacy M. Butterfield  POLK
CFN# 2019140325 OR BK 10898  PG 837 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

**(e) Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**23. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Section 23.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**24. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.**

**25. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**26. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**27. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc. Page 8 of 10

Initials: WRwr     T.V.

FLEFHA15DE 0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898 PG 838 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

**DEBORAH JO WINTER**
Printed Name

_____

Kasi Skinner
Printed Name

_____  _____ (Seal)
WILLIAM A REYES MALDONADO                DATE
1506 Bryant Ave
Bronx, NY 10460

_____  _____ (Seal)
TAMARA I. VEGA                          DATE

_____

_____

State of Florida                          County of POLK

The foregoing instrument was acknowledged before me this 7th day of JUNE, 2019 by WILLIAM A REYES MALDONADO AND TAMARA I. VEGA, who is/are personally known to me or who has/have produced _____ as identification.

_____
Signature

DEBORAH WINTER
MY COMMISSION # GG 136101
EXPIRES: August 20, 2021
Bonded Thru Notary Public Underwriters

**DEBORAH JO WINTER**
Printed Name

_____
Title or Rank

_____
Serial Number (if any)

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                          Page 9 of 10

Initials: WARM    T-V.
FLEFHA15DE 0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST

LOAN #:

Lender: Union Home Mortgage Corp.
NMLS ID: 2229
Loan Originator: Aracelis Lorenzana
NMLS ID: 1534883

Initials: _____   T.V.

FLEFHA15DE  0316
FLEDEED (CLS)
06/07/2019 02:40 PM PST



Stacy M. Butterfield  POLK
CFN# 2019140325 OR BK 10898  PG 840 Pgs 0831-0843 07/05/2019 11:56:27 AM

# EXHIBIT "A"
## Property Description

**Closing Date:**      **June 7, 2019**

**Buyer(s):**          **William A. Reyes Maldonado and Tamara I. Vega**

**Property Address:**  **8167 Westmont Terrace Drive, Lakeland, FL 33810**

PROPERTY DESCRIPTION:

Lot 126, Copper Ridge Terrace, according to the map or plat thereof, as recorded in Plat Book 126, Page(s) 1 and 2, of the Public Records of Polk County, Florida.

Stacy M. Butterfield  POLK
CFN# 2019140325 OR BK 10898  PG 841 Pgs 0831-0843 07/05/2019 11:56:27 AM

LOAN #: ▮▮▮▮▮
MIN: 1000745-0000594104-0

FHA Case No. ▮▮▮▮▮

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **7th**      day of **June, 2019,**      and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to **Union Home Mortgage Corp., a Corporation**

("Lender") of the same date and covering the Property described in the Security Instrument and located at:
**8167 Westmont Terrace Drive**
**Lakeland, FL 33810-2083.**

The Property Address is a part of a planned unit development ("PUD") known as
**Copper Ridge Terrace**

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. So long as the Owners Association (or equivalent entity holding title to common areas and facilities), acting as trustee for the homeowners, maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the property located in the PUD, including all improvements now existing or hereafter erected on the mortgaged premises, and such policy is satisfactory to Lender and provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and other hazards included within the term "extended coverage," and loss by flood, to the extent required by the Secretary, then:
   (i) Lender waives the provision in Paragraph 3 of this Security Instrument for the monthly payment to Lender of one-twelfth of the yearly premium installments for hazard insurance on the Property, and
   (ii) Borrower's obligation under Paragraph 5 of this Security Instrument to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.
   Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage and of any loss occurring from a hazard. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, with any excess paid to the entity legally entitled thereto.

B. Borrower promises to pay all dues and assessments imposed pursuant to the legal instruments creating and governing the PUD.

C. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph C shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

FHA Multistate PUD Rider - 9/2014
Ellie Mae, Inc.
         Page 1 of 2

Initials:     T.V.
FHA15PUDRD 0815
P8700PUU (CLS)
06/07/2019 02:40 PM PST



Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898 PG 842 Pgs 0831-0843 07/05/2019 11:56:27 AM

**LOAN #:**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____     _____ (Seal)
**WILLIAM A REYES MALDONADO**                    DATE

_____     _____ (Seal)
**TAMARA I. VEGA**                               DATE

FHA Multistate PUD Rider - 9/2014
Ellie Mae, Inc.

Page 2 of 2

Initials: _____
FHA15PUDRD  0815
P8700PUU (CLS)
06/07/2019 02:40 PM PST

T.V.

Stacy M. Butterfield POLK
CFN# 2019140325 OR BK 10898  PG 843 Pgs 0831-0843 07/05/2019 11:56:27 AM



# EXHIBIT C

INSTR # 2021160539
BK 11769 Pgs 0697-0702 PG(s)6
06/21/2021 12:46:54 PM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 52.50

This Document Prepared By:
**ROBERT JONES**
**CENLAR FSB**
**425 PHILLIPS BLVD.**
**EWING, NJ 08618**
**855-839-6253**

When Recorded Mail To:
**FIRST AMERICAN TITLE CO.**
**FAMS – DTO RECORDING**
**3 FIRST AMERICAN WAY**
**SANTA ANA, CA  92707-9991**

**Tax/Parcel #:  102723-000827-001260**
_____ [Space Above This Line for Recording Data] _____

**FHA Case No.:** ▮▮▮▮▮
**Loan No:** ▮▮▮▮▮

# PARTIAL CLAIMS MORTGAGE

**This document is tax exempt due to the lender on the document is The Secretary of Housing and Urban Development, a government agency**

THIS SUBORDINATE MORTGAGE ("Security Instrument") is given on **JUNE 8, 2021**. The mortgagor is **WILLIAM A. REYES MALDONADO AND TAMARA I. VEGA, HUSBAND AND WIFE**  ("Borrower"), whose address is **8167 WESTMONT TERRACE DR, LAKELAND, FLORIDA 33810**. This Security Instrument is given to the **Secretary of Housing and Urban Development**, whose address is **451 Seventh Street SW, Washington, DC 20410** ("Lender").  Borrower owes Lender the principal sum of **SIXTEEN THOUSAND NINE HUNDRED TWENTY-THREE DOLLARS AND 11 CENTS** Dollars (U.S. **$16,923.11**). This debt is evidenced by Borrower's note dated the



same date as this Security Instrument ("Note"), which provides for the full debt, if not paid earlier, due and payable on **JULY 1, 2049**.

This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, advanced under Paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to the Lender, with power of sale, the following described property located in the COUNTY of **POLK**, State of **FLORIDA**:

which has the address of , **8167 WESTMONT TERRACE DR, LAKELAND, FLORIDA 33810** (herein "Property Address");

### SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:

Tax Parcel No. **102723-000827-001260**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing, is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal.** Borrower shall pay when due the principal of the debt evidenced by the Note.

**2. Borrower Not Released; Forbearance By Lender Not a Waiver**. Extension of the time of payment of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**3. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors

Partial Claims Agreement 05312021_105



Stacy M. Butterfield  POLK
CFN# 2021160539 OR BK 11769  PG 698 Pgs 0697-0702 06/21/2021 12:46:54 PM

and assigns of Lender and Borrower. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the term of this Security Instrument or the Note without that Borrower's consent.

**4. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to: Department of Housing and Urban Development, Attention: Single Family Notes Branch, 451 Seventh Street SW, Washington, DC 20410 or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**5. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**6. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**7. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any other remedies permitted by Applicable Law. Lender shall be


Stacy M. Butterfield POLK
CFN# 2021160539 OR BK 11769 PG 699 Pgs 0697-0702 06/21/2021 12:46:54 PM

Case 1:24-cv-08930-DEH-HJR   Document 1-1   Filed 11/21/24   Page 59 of 90

entitled to collect all expenses incurred in pursuing the remedies provided in this Section 7, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 4 of the Subordinate Note, the Secretary may invoke the non-judicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. § 3751 *et seq.* ) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided by the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph or applicable law.

Partial Claims Agreement 05312021_105

Page 4

Stacy M. Butterfield POLK
CFN# 2021160539 OR BK 11769 PG 700 Pgs 0697-0702 06/21/2021 12:46:54 PM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument.

_Willian A Rey mubonad_

Borrower: **WILLIAM A. REYES MALDONADO**

6-14-21
**Date**

_Tamara Vega_

Borrower: **TAMARA I. VEGA** **signing solely to acknowledge this Agreement, but not to incur any personal liability for the debt**

6/14/2021
**Date**

_____[Space Below This Line for Acknowledgments]_____

**BORROWER ACKNOWLEDGMENT**

STATE OF FLORIDA
COUNTY OF __Polk__

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this __14 th__ day of __June__ , __2021__ (year), by **WILLIAM A. REYES MALDONADO, TAMARA I. VEGA** (name of person acknowledging).

_Destiny Evans_

(Signature of Notary Public - State of Florida)

_Destiny Evans_

(Print, Type, or Stamp Commissioned Name of Notary Public)

Personally Known OR Produced Identification

Type of Identification Produced__ FLDL __

> **DESTINY EVANS**
> Notary Public - State of Florida
> Commission # HH 087302
> My Comm. Expires Mar 14, 2025

Partial Claims Agreement 05312021_105

Page 5

## EXHIBIT A

**BORROWER(S): WILLIAM A. REYES MALDONADO AND TAMARA I. VEGA, HUSBAND AND WIFE**

**LOAN NUMBER:** <span style="background:black">     </span>

**LEGAL DESCRIPTION:**

**The land referred to in this document is situated in the CITY OF LAKELAND, COUNTY OF POLK, STATE OF FLORIDA, and described as follows:**

**LOT 126, COPPER RIDGE TERRACE, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 126, PAGE(S) 1 AND 2, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.**

**Tax/Parcel No. 102723-000827-001260**

**ALSO KNOWN AS: 8167 WESTMONT TERRACE DR, LAKELAND, FLORIDA 33810**



Stacy M. Butterfield POLK
CFN# 2021160539 OR BK 11769 PG 702 Pgs 0697-0702 06/21/2021 12:46:54 PM

# EXHIBIT D

INSTR # 2022258825
BK 12431 Pgs 0431-0435 PG(s)5
09/23/2022 01:51:17 PM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 44.00
MTG DOC 92.75

**After Recording Return To:**
RUTH RUHL, P.C.
Recording Department
12700 Park Central Drive, Suite 850
Dallas, Texas 75251

**This Document Prepared By:**
RUTH RUHL, P.C.
Ruth Ruhl, Esquire
12700 Park Central Drive, Suite 850
Dallas, Texas 75251

_____[Space Above This Line For Recording Data]_____

Loan No.:
Investor Loan No.:

FHA Case No.:

# PARTIAL CLAIM MORTGAGE

THIS SUBORDINATE MORTGAGE ("Security Instrument") is given on August 22nd, 2022. The Mortgagor is WILLIAM REYES MALDONADO and TAMARA I. VEGA, HUSBAND AND WIFE, whose address is 8167 WESTMONT TERRACE DR, LAKELAND, Florida 33810 ("Borrower"). This Security Instrument is given to the Secretary of Housing and Urban Development, and whose address is 451 Seventh Street, SW, Washington, DC 20410 ("Lender"). Borrower owes Lender the principal sum of twenty six thousand four hundred two and 46/100 Dollars (U.S. $26,402.46). This debt is evidenced by Borrower' note dated the same date as this Security Instrument ("Note"), which provides for the full debt, if not paid earlier, due and payable on July 1st, 2049. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, advanced under Paragraph 2 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to the Lender the following described property located in POLK County, Florida:

First Lien Mortgage Information: Dated June 7th, 2019 and recorded in Book 10898, Page 0831, Instrument No. 2019140325.

**"This document is exempt from intangible tax because the Lender is a government agency."**

**FLORIDA PARTIAL CLAIM MORTGAGE**

Page 1 of 4
Rev. 06/15

Loan No.: [REDACTED]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which has the address of 8167 WESTMONT TERRACE DR, LAKELAND, Florida 33810.

("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower and Lender covenant and agree as follows:

UNIFORM COVENANTS.

1. **Payment of Principal.** Borrower shall pay when due the principal of the debt evidenced by the Note.

2. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

3. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the term of this Security Instrument or the Note without that Borrower's consent.

**FLORIDA PARTIAL CLAIM MORTGAGE**

Page 2 of 4
Rev. 06/15

Loan No.: ▮▮▮▮▮▮▮

**4. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to: **Department of Housing and Urban Development, Attention: Single Family Notes Branch, 451 Seventh Street, SW, Washington, DC 20410 or any address Lender designates** by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**5. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**6. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**7. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 7, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 4 of the Subordinate Note, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. § 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph or Applicable Law.**

**8. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**9. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**10. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

---

**FLORIDA PARTIAL CLAIM MORTGAGE**

Page 3 of 4
Rev. 06/15

Stacy M. Butterfield  POLK
CFN# 2022258825 OR BK 12431  PG 433 Pgs 0431-0435 09/23/2022 01:51:17 PM

Loan No.:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

9/19/2022
Date

_____ (Seal)
WILLIAM REYES MALDONADO   –Borrower

9/19/2022
Date

_____ (Seal)
TAMARA I. VEGA, signing solely to   –Borrower
acknowledge this Agreement, but not to
incur any personal liability for the debt

_____ (Seal)
Date                                    –Borrower

_____ (Seal)
Date                                    –Borrower

_____ (Seal)
Date                                    –Borrower

[Space Below This Line for Acknowledgment]

State of     FL      §
                     §
County of    POLK    §

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this _Sept 19_, _2022_ [date], by WILLIAM REYES MALDONADO and TAMARA I. VEGA [name of person acknowledging], who is personally known to me or who has produced FL DL + US Passport [type of identification] as identification.

_____
Signature of Person Taking Acknowledgment

Yadira Oliva

Name Typed, Printed or Stamped
Notary Public   FL Notary
Title or Rank

YADIRA OLIVA
Notary Public - State of Florida
Commission # HH 195604
My Comm. Expires Jan 5, 2026

_____
Serial Number, if any

FLORIDA PARTIAL CLAIM MORTGAGE

Page 4 of 4
Rev. 06/15

EXHIBIT "A"

*LOT 126, COPPER RIDGE TERRACE, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 126, PAGE(S) 1 AND 2, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.*

# TAX ID: 23-27-10-000827-001260

EXHIBIT "A"

Stacy M. Butterfield POLK
CFN# 2022258825 OR BK 12431  PG 435 Pgs 0431-0435 09/23/2022 01:51:17 PM

Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 68 of 90

# EXHIBIT E

FILED: BRONX COUNTY CLERK 10/14/2024 08:38 PM INDEX NO. 816499/2024E

NYSCEF DOC. NO. 8 RECEIVED NYSCEF: 10/14/2024

CASE 1.24-cv-06990-DEH-HJR Document 1-1 Filed 11/21/24 Page 69 of 90

**Marsha M. Faux, CFA, ASA**
Polk County Property Appraiser
Print Date: 09/25/2024

CHANSAVIANG MIRINDA
8167 WESTMONT TERRACE DR
LAKELAND FL 33810-2083

8167 WESTMONT TERRACE DR LAKELAND 33810

23-27-10-000827-001260

COPPER RIDGE TERRACE PB 126 PGS 1-2 LOT 126

# 2024

| Building Characteristics | |
|---|---|
| **Category** | **Type** |
| Drive/Walk Way | CONCRETE |
| Exterior Wall | STUCCO |
| Fencing | None |
| Floor Cover | CARPETING |
| Frame / Const Type | MASONRY/BLOCK |
| Interior Wall | DRYWALL |
| Roof Structure | HIP-SHINGLE |
| Shape | RECTANGLE |
| Style | SINGLE FAMILY |
| Substruct | Continuous Wall |

| Category | Units | Adjustment |
|---|---|---|
| Cntrl Heating / AC | YES | 0 |
| Fireplace Stacks | 1 | 3390 |
| Fixtures: Addl | 2 | 0 |
| Room: Bedroom | 4 | 0 |
| Room: Full Bath | 2 | 0 |
| Room: Half Bath | 0 | 0 |

| Base Rate Adj. | Adjustment |
|---|---|
| Size Adjustment | 0.90210 |
| Story Height Adj | 1.00000 |

| Depreciation Adj | Adjustment |
|---|---|

| Type | Class | Quality | Perimeter |
|---|---|---|---|
| SF | 0 | AV | 200 |

| AYB | EYB | RCNLD | Norm Dpr | %Good |
|---|---|---|---|---|
| 2005 | 2005 | 217,411 | 12.00% | 88.00% |

**RCNLD - Replacement Cost New Less Depreciation**

0100 SFR up to 2.49 AC



Card 1 of 1
Building No: 1 - Single Family

| Total Acreage: | 0.26 |
|---|---|
| Millage Code: | 90000 |
| Neighborhood Code: | 310075.00 |
| Neighborhood Adj: | 1.05 |

| Value Summary 2024 | |
|---|---|
| Market Valuation Method: Marshall & Swift | |
| **Market Valuation:** | |
| Market Land Value: | 35,000 |
| Classified Land Value: | 0 |
| * Assd Land Value: | 35,000 |
| * Tot Bldg Value: | 217,411 |
| * Tot XF Value: | 15,900 |
| Tot Jst Value: | 268,311 |
| Market Value: | 268,311 |
| **Homestead Cap:** | |
| Overall % Cap: | 0.00% |
| Cap Base Year: | 0 |
| HX Usage % Cap: | 0.00% |
| Prior Market: | 0 |
| Prior Base: | 0 |
| Initial Base: | 0 |
| Current Base: | 0 |
| Maximum Cap: | 0 |
| Market Value: | 0 |
| Capped Value: | 0 |
| **Non-Homestead Cap:** | |
| Cap Base Year: | 2020 |
| Usage % Cap: | 100.00% |
| Prior Market: | 284,780 |
| Prior Base: | 240,248 |
| Initial Base: | 240,248 |
| Current Base: | 240,248 |
| Maximum Cap: | 264,273 |
| Market Value: | 268,311 |
| **Assessment Values:** | |
| Ag Land: | 0 |
| Homestead: | 0 |
| Non-Homestead: | 264,273 |
| Cap Diff: | 4,038 |
| Portability: | 0 |
| Total Value: | 264,273 |
| Exemption Value: | 0 |
| Taxable Value: | 264,273 |
| School Taxable Val: | 268,311 |

| ** Sales Data | | | | | | |
|---|---|---|---|---|---|---|
| Date | Q | VI | OR Bk/PG | Price | Grantor | Grantee |
| 01/16/2024 | 01 | I | 12981 / 02293 | 359,900 | MALDONADO WILLIAM A REYES | CHANSAVIANG MIRINDA |
| 06/07/2019 | 01 | I | 10898 / 00829 | 240,000 | PAPP PAULA TRUST | MALDONADO WILLIAM A REYES |
| 09/06/2018 | 11 | I | 10626 / 00996 | 100 | PAPP MARTINI PAULA | PAPP PAULA TRUST |
| 10/26/2009 | 01 | I | 08004 / 01808 | 129,900 | LOPEZ ROMAN E | MARTINI PAULA PAPP |

* The Just Market Value for income properties is derived from the actual/potential income generated. As a result, the Just Market Value for properties valued by the Income approach may not be equal to the sum of the values for Land, Building, and Misc Item.

Please Note: All address, owner, legal description, and sales data is current. All other data, including buildings, extra features, land lines, value and tax information, is from 2024 tax roll. The information provided is believed to be correct but is subject to change and is not guaranteed.

**Additional lines of information pertaining to this record are not displayed due to size limitation of this report. For additional data, and definitions of terms used on this report please see:
http://www.polkpa.org/CamaDisplay.aspx?OutputMode=Display&SearchType=RealEstate&ParcelID=232710000827001260

Case 1:24-cv-08990-DEH-HJR    Document 1-1    Filed 11/21/24    Page 79 of 90

Marsha M. Faux, CFA, ASA
Polk County Property Appraiser
Print Date: 09/25/2024

**2024**

CHANSAVIANG MIRINDA
8167 WESTMONT TERRACE DR
LAKELAND FL 33810-2083

Address:
8167 WESTMONT TERRACE DR LAKELAND 33810
COPPER RIDGE TERRACE PB 126 PGS 1-2 LOT 126

## Extra Features
**Note: A Building Number of 0 indicates the Extra Feature value is related to the overall property and is not building specific.**

| # | Use Code | Description | Bld Num | Units | Grade | Unit Price | Adjusted Unit Price | Factor | Orig % | Actual Year Built | Effective Year Built | Roll Year | % Condition | Depreciated Value |
|---|----------|-------------|---------|-------|-------|-----------|---------------------|--------|--------|-------------------|----------------------|-----------|-------------|-------------------|
| 1 | SHD1 | SHED 500 | 1 | 1 | 3 | 500.00 | 500.00 | 1.00 | 100.00% | 2006 | 2006 | 2013 | 100.00% | 500 |
| 2 | POL1 | POOL 17000 | 1 | 1 | 0 | 17,000.00 | 17,000.00 | 1.00 | 100.00% | 2005 | 2005 | 2006 | 70.00% | 11,900 |
| 3 | SCE1 | SCREEN ENCLOSURE 3500 | 1 | 1 | 0 | 3,500.00 | 3,500.00 | 1.00 | 100.00% | 2005 | 2005 | 2006 | 100.00% | 3,500 |

## Land Lines
**Note: Land Line values are related to the overall property and are not building specific.**

| # | Land Type | Use Code | Description | Front Feet | Depth | Units | Unit Type | Depth Table | Depth Factor | Unit Price | Adjusted Unit Price | % Condition | Adjusted Value |
|---|-----------|----------|-------------|-----------|-------|-------|-----------|-------------|--------------|-----------|---------------------|-------------|----------------|
| 1 | C | 0011 | Standard Site | 0.00 | 0.00 | 1.00 | U | 0 | 1.00 | 35,000.00 | 35,000.00 | 100.00% | 35,000 |

## Sub Areas for Building 1
**Please see  https://www.polkpa.org/showLookupTable.aspx?table=sar  for a list of codes and descriptions.**

| SAR | Area | Heat | Rate | Cost New | SAR | Area | Heat | Rate | Cost New | SAR | Area | Heat | Rate | Cost New |
|-----|------|------|------|----------|-----|------|------|------|----------|-----|------|------|------|----------|
| BAS | 1,696 | X | 123.92 | 210,168 | UOP | 24 | | 41.33 | 992 | UOP | 120 | | 41.33 | 4,960 |
| | | | | | | | | | | UGR | 400 | | 68.87 | 27,548 |

| | |
|---|---|
| Gross Area: | 2,240 |
| Living Area: | 1,696 |

# EXHIBIT F

INSTR # 2024017252
BK 12981 Pgs 2293-2295 PG(s)3
01/24/2024 08:09:23 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 27.00
DEED DOC 2,519.30

Prepared by and return to:
Serena Orgin
RICHR TITLE LLC
2627 Northeast 203rd Street
SUITE 202
Miami, FL 33180
(650) 758-7554
File No 2023-279

Parcel Identification No 23-27-10-000827-001260

_____[Space Above This Line For Recording Data]_____

# WARRANTY DEED
### (STATUTORY FORM – SECTION 689.02, F.S.)

**This indenture** made the **16th day of January, 2024** between **William A. Reyes Maldonado and Tamara I. Vega, husband and wife**, whose post office address is **8167 Westmont Terrace Drive, Lakeland, FL 33810**, of the County of Polk, State of Florida, Grantors, to **Mirinda Chansaviang, a married man**, whose post office address is **8167 Westmont Terrace Drive, Lakeland, FL 33810**, of the County of Polk, State of Florida, Grantees:

**Witnesseth**, that said Grantors, for and in consideration of the sum of TEN DOLLARS (U.S.$10.00) and other good and valuable considerations to said Grantors in hand paid by said Grantees, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said Grantees, and Grantees' heirs and assigns forever, the following described land, situate, lying and being in Polk, Florida, to-wit:

Lot 126, COPPER RIDGE TERRACE, according to the map or plat thereof, as recorded in Plat Book 126, Page(s) 1 and 2, of the Public Records of Polk County, Florida.

**Together with** all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**Subject to** taxes for 2024 and subsequent years, not yet due and payable; covenants, restrictions, easements, reservations and limitations of record, if any.

**TO HAVE AND TO HOLD** the same in fee simple forever.

**And** Grantors hereby covenant with the Grantees that the Grantors are lawfully seized of said land in fee simple, that Grantors have good right and lawful authority to sell and convey said land and that the Grantors hereby fully warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever.

**In Witness Whereof,** Grantors have hereunto set Grantors' hand and seal the day and year first above written.

*Signed, sealed and delivered in our presence:*

_____
WITNESS 1 signature

PRINT NAME: Joseph Von Kemp

3015 Silverado Terrace

Winter Haven FL 33884
WITNESS 1 ADDRESS

_____
WITNESS 2 signature

PRINT NAME: Brandon Ford

2372 Roanoke Ct

Lake Mary, FL 32746
WITNESS 2 ADDRESS


_____
Tamara I. Vega


STATE OF FLORIDA
COUNTY OF POLK

The foregoing instrument was acknowledged before me by means of (✓) physical presence or ( ) online notarization this 16th day of January, 2024, by Tamara I Vega.

_____
Signature of Notary Public
Print, Type, Stamp Name of Notary

JOSEPH VON KEMP
Commission # HH 238269
Expires March 9, 2028

Personally Known:_____ OR Produced Identification:_____✓_____
Type of Identification   FL DL

INDEX NO. 816499/2024E

_WITNESS 1 signature_

PRINT NAME: Gilbert Vega

980 Al Post

Bronx, NY 10459
WITNESS 1 ADDRESS

William A. Reyes Maldonado

_WITNESS 2 signature_

PRINT NAME: James Exantus

99 Wall St

New York, NY 10805
WITNESS 2 ADDRESS


STATE OF NEW YORK
COUNTY OF BRONX

The foregoing instrument was acknowledged before me by means of (✓) physical presence or ( ) online notarization this 16th day of January, 2024, by William A. Reyes Maldonado


Signature of Notary Public
Print, Type/Stamp Name of Notary

Personally Known:_____ OR Produced Identification: ✓_____
Type of Identification          Driver License


JAMES EXANTUS
Notary Public - State of New York
No. 01EX6434260
Qualified in Kings County
My Commission Expires 06/06/2026


File No.: 2023-279

Warranty Deed

Page 3 of 3

INDEX NO. 816499/2024E
Case 1:24-cv-08930-DEH-HJR    Document 1-1    Filed 11/21/24    Page 75 of 90
RECEIVED NYSCEF: 10/14/2024

# EXHIBIT G

INSTR # 2024025058
BK 12993 Pg 0030 PG(s)1
02/01/2024 10:42:34 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 10.00

Loan Number █████████

Document Prepared By:
Jennifer Zak/NTC, 2100 Alt. 19
North, Palm Harbor, FL 34683
(800)346-9152

When Recorded Return To:
Cenlar FSB
C/O Nationwide Title Clearing, LLC
2100 Alt. 19 North
Palm Harbor, FL 34683

## SATISFACTION OF MORTGAGE

**KNOW ALL MEN BY THESE PRESENTS:** That **UNION HOME MORTGAGE CORP.**, is the lienholder of a certain Mortgage Deed executed by **WILLIAM A. REYES MALDONADO AND TAMARA I. VEGA** recorded in Official Records **Book 10898 and Page 0831**, in the office of the Clerk of the Circuit Court of **POLK** County, **Florida**, upon the property situated in said State and County as more fully described in said Mortgage.

The present lienholder of the mortgage hereby acknowledges full payment and satisfaction of said note and Mortgage Deed, and hereby directs the Clerk of the said Circuit Court to cancel the same of record.

**IN WITNESS WHEREOF,** said lienholder has caused this instrument to be executed by its VICE PRESIDENT on __1__/__26__/__2024__ (MM/DD/YYYY).

**UNION HOME MORTGAGE CORP.**

By: _____
Cynthia Thomas
**VICE PRESIDENT**

_____ Witness
Sharon Kent
425 Phillips Blvd., Ewing, NT 08618

_____ Witness
Jacquelyn Boothby
425 Phillips Blvd., Ewing, NJ 08618

STATE OF NEW JERSEY
COUNTY OF MERCER
On __01/26/2024__ (MM/DD/YYYY) before me, Robin Brown, Notary Public in and for said county, personally appeared Cynthia Thomas, as VICE PRESIDENT of UNION HOME MORTGAGE CORP. who has/have satisfactorily identified him/her/themselves as the signer(s) to the above referenced document.

_____
Robin Brown
Notary Public - STATE OF NEW JERSEY
Commission expires: 02/15/2027

ROBIN BROWN
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 50185731
MY COMMISSION EXPIRES FEB. 15, 2027

CENRC 440253471 AMERIHOME MORTGAGE C    T252401-11:35:25 [C-1] RCNFL1

*D0104311682*

# EXHIBIT H

INSTR # 2024024770
BK 12992 Pg 1178 PG(s)1
02/01/2024 08:40:05 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 10.00

**Record and Return To:**
Information Systems and Networks
Corporation
Release Department
2000 N Classen Blvd Suite 3200
Oklahoma City, OK 73106

**Prepared By:**
**Sofia Tisnes**
Information Systems and Networks
Corporation
2000 N Classen Blvd Suite 3200
Oklahoma City, OK 73106

Loan #: ▮▮▮▮▮▮▮▮▮

---

## Release of Mortgage

KNOW ALL MEN BY THESE PRESENTS that Secretary of Housing and Urban Development, the mortgagee of a certain Mortgage, whose parties, dates and recording information are listed below, does hereby acknowledge full payment and satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: **WILLIAM A REYES MALDONADO AND TAMARA I VEGA HUSBAND AND WIFE,**
Original Mortgagee: **Secretary of Housing and Urban Development**
In the Official Records of **Polk** County, **FL** affecting Real Property and more particularly, described on said Mortgage referred to herein.

Dated: **06/08/2021** Recorded: **06/21/2021** Instrument: **2021160539** Book: **11769** Page: **0697** in **Polk** County, **FL**
Loan Amount: **$16,923.11**
Property Address: **8167 WESTMONT TERRACE DR, LAKELAND, FL 33810**
Parcel Tax ID:  **102723-000827-001260**
IN WITNESS WHEREOF, **Secretary of Housing and Urban Development** by the officers duly authorized, has duly executed the foregoing instrument.
Date: **01/31/2024.**

**Secretary of Housing and Urban Development  by Its**
**Attorney in Fact Information Systems and Networks**
**Corporation**

By: _____
Name: **Shannon Grayson**
Title: **Authorized Agent**
Power of Attorney previously recorded on **05/02/2022,**
as Instrument No. **2022118619,** in Book No. **12234,** at
Page No. **0563-0564** in **Polk** County, FL.

STATE OF **Oklahoma**      } s.s.
COUNTY OF **Oklahoma**

On **01/31/2024,** before me, **Connor Knoch,** Notary Public, personally appeared **Shannon Grayson, Authorized Agent** of **Information Systems and Networks Corporation,** Attorney in Fact for **Secretary of Housing and Urban Development** , to be the person whose name is subscribed to the within instrument and acknowledged to me that she/he/they executed the same in her/his/their authorized capacity(ies), and that by her/his/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____

Notary Public: **Connor Knoch**
My Commission Expires: **01/24/2027**
Commission #: **23001130**

**CONNOR KNOCH**
NOTARY PUBLIC
STATE OF OKLAHOMA
Commission # 23001130  Expires 01/24/27

INSTR # 2024024772
BK 12992 Pg 1180 PG(s)1
02/01/2024 08:40:35 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 10.00

**Record and Return To:**
Information Systems and Networks
Corporation
Release Department
2000 N Classen Blvd Suite 3200
Oklahoma City, OK 73106

**Prepared By:**
**Sofia Tisnes**
Information Systems and Networks
Corporation
2000 N Classen Blvd Suite 3200
Oklahoma City, OK 73106

Loan #: [redacted]

## Release of Mortgage

KNOW ALL MEN BY THESE PRESENTS that Secretary of Housing and Urban Development, the mortgagee of a certain Mortgage, whose parties, dates and recording information are listed below, does hereby acknowledge full payment and satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: **WILLIAM REYES MALDONADO AND TAMARA I VEGA HUSBAND AND WIFE,**
Original Mortgagee: **Secretary of Housing and Urban Development**
In the Official Records of **Polk** County, **FL** affecting Real Property and more particularly, described on said Mortgage referred to herein.

Dated: **08/22/2022** Recorded: **09/23/2022** Instrument: **2022258825** Book: **12431** Page: **0431** in **Polk** County, **FL**
Loan Amount: **$26,402.46**
Property Address: **8167 WESTMONT TERRACE DR, LAKELAND, FL 33810**
IN WITNESS WHEREOF, **Secretary of Housing and Urban Development** by the officers duly authorized, has duly executed the foregoing instrument.
Date: **01/31/2024.**

**Secretary of Housing and Urban Development by Its**
**Attorney in Fact Information Systems and Networks**
**Corporation**

By: _[signature]_

Name: **Shannon Grayson**
Title: **Authorized Agent**
Power of Attorney previously recorded on **05/02/2022,**
as Instrument No. **2022118619,** in Book No. **12234,** at
Page No. **0563-0564** in **Polk** County, **FL.**

STATE OF **Oklahoma**
COUNTY OF **Oklahoma** } s.s.

On **01/31/2024,** before me, **Connor Knoch,** Notary Public, personally appeared **Shannon Grayson,**
**Authorized Agent** of **Information Systems and Networks Corporation**, Attorney in Fact for **Secretary of Housing and Urban Development** , to be the person whose name is subscribed to the within instrument and acknowledged to me that she/he/they executed the same in her/his/their authorized capacity(ies), and that by her/his/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_[signature]_

Notary Public: **Connor Knoch**
My Commission Expires: **01/24/2027**
Commission #: **23001130**

**CONNOR KNOCH**
NOTARY PUBLIC
STATE OF OKLAHOMA
Commission # 23001130 Expires 01/24/27

# EXHIBIT I

**Certified Mail Tracking Information**

**Name: William Reyes Maldonado**
**Date sent: 4/12/24**

**EQ**: https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9407111898765406907842

**EX:** https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9407111898765406907705

**TU**: https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9407111898765406907989

## **Notice of Dispute**

**William Reyes Maldonado**
606 Beach Avenue APT 2
Bronx, New York 10473
Date of Birth: ████
SS#: ████

Equifax Information Services LLC
P.O. Box 740256
Atlanta, GA 30374 - 0256

04/12/2024

Letter to Dispute inaccurate Items on my credit Report

The following accounts are presenting inaccurate information on my credit report and I would like to place them in dispute for the following reasons:

1. Payment history is inaccurate
   AMERIHOME MORTGAGE COMPANY LLC
   Account Number: XXXXXXXX4434
   Please investigate this mortgage account, because it is missing data in the payment history. This mortgage was opened in June 2019 with Union Mortgage, and was transferred to Amerihome in June 2022. There is no data reporting in the payment history from June 2022 to October 2022. This is inaccurate and misleading. The payment history is missing several on-time payment remarks from June 2022 to October 2022. There is also missing data on March, April, August, September, and December 2023. Lastly, there is a 60 day late remark on January 2024. This is inaccurate because this mortgage was paid off and closed in January 2024. How can I be 60 days late in January when this is when I paid the loan off? Please investigate this account and make the necessary changes to my credit report. It is missing several payment remarks in the payment history, which is misleading and hurtful to my credit.

2. This is a duplicate account
   UNION HOME M
   Account Number: XXXXXXXXX4434
   This is duplicate account. This mortgage was transferred to Amerihome Mortgage on June 1st, 2022. There should not be any payment history reporting on this account after June 2022, because the loan was no longer with Union Home Mortgage. This is inaccurate and misleading, as this account is inaccurately reporting late remarks on April, September, and October 2023. The loan was not with Union Home Mortgage in 2023, so how can they be reporting these late remarks? Also, there are duplicate late remarks reporting on October 2023 on this Union Home Mortgage tradeline, and the Amerihome Mortgage tradeline. Both of these accounts are reporting a late remark for the same month, when these are for the same mortgage loan. This duplicate late remark is very hurtful to my credit. Please investigate this account and the data it is reporting, and make the necessary changes to my credit report, because the inaccurate payment history and

duplicate late remark, are hurting my credit.

3. Payment history is inaccurate
   ALLY FINANCIAL
   Account Number: xxxxxxxx0225
   Please investigate this auto loan because it is missing data in the payment history. This auto loan was opened in May 2013. There is no data showing in the payment history from 2015 to October 2018. There is also no data reporting in the payment history from December 2018 to August 2019 when the loan was paid and closed. The payment history is missing several on-time payment remarks that would be beneficial to my credit. The inaccurate reporting and lack of data showing in the payment history are hurtful to my credit. Please investigate this account and make the necessary changes to reflect the accurate on-time payments I have made throughout the life of this loan.

Please investigate the presented issues and make the necessary changes to my credit report, to reflect each account accurately. Enclosed are my identification documents, including my driver's license, SSN card, and a bill showing my address.

Thank you for your time and help in this matter.

Sincerely,

William Reyes Maldonado

**<u>Notice of Dispute</u>**

**William Reyes Maldonado**
606 Beach Avenue APT 2
Bronx, New York 10473
Date of Birth: ▮▮▮▮
SS#: ▮▮▮▮

Experian
P.O. Box 4500
Allen, TX 75013

04/12/2024

Letter to Dispute inaccurate Items on my credit Report

The following accounts are presenting inaccurate information on my credit report and I would like to place them in dispute for the following reasons:

1. Payment history is inaccurate
   AMERIHOME MORTGAGE COMPANY LLC
   Account Number: XXXXXXXX4434
   Please investigate this mortgage account, because it is missing data in the payment history. This mortgage was opened in June 2019 with Union Mortgage, and was transferred to Amerihome in June 2022. There is no data reporting in the payment history from June 2022 to October 2022. This is inaccurate and misleading. The payment history is missing several on-time payment remarks from June 2022 to October 2022. There is also missing data on March, April, August, September, and December 2023. Lastly, there is a 60 day late remark on January 2024. This is inaccurate because this mortgage was paid off and closed in January 2024. How can I be 60 days late in January when this is when I paid the loan off? Please investigate this account and make the necessary changes to my credit report. It is missing several payment remarks in the payment history, which is misleading and hurtful to my credit.

2. This is a duplicate account
   UNION HOME M
   Account Number: XXXXXXXXX4434
   This is duplicate account. This mortgage was transferred to Amerihome Mortgage on June 1st, 2022. There should not be any payment history reporting on this account after June 2022, because the loan was no longer with Union Home Mortgage. This is inaccurate and misleading, as this account is inaccurately reporting late remarks on April, September, and October 2023. The loan was not with Union Home Mortgage in 2023, so how can they be reporting these late remarks? Also, there are duplicate late remarks reporting on October 2023 on this Union Home Mortgage tradeline, and the Amerihome Mortgage tradeline. Both of these accounts are reporting a late remark for the same month, when these are for the same mortgage loan. This duplicate late remark is very hurtful to my credit. Please investigate this account and the data it is reporting, and make the necessary changes to my credit report, because the inaccurate payment history and

duplicate late remark, are hurting my credit.

3. Payment history is inaccurate
   ALLY FINANCIAL
   Account Number: xxxxxxxx0225
   Please investigate this auto loan because it is missing data in the payment history. This auto loan was opened in May 2013. There is no data showing in the payment history from 2015 to October 2018. There is also no data reporting in the payment history from December 2018 to August 2019 when the loan was paid and closed. The payment history is missing several on-time payment remarks that would be beneficial to my credit. The inaccurate reporting and lack of data showing in the payment history are hurtful to my credit. Please investigate this account and make the necessary changes to reflect the accurate on-time payments I have made throughout the life of this loan.

Please investigate the presented issues and make the necessary changes to my credit report, to reflect each account accurately. Enclosed are my identification documents, including my driver's license, SSN card, and a bill showing my address.

Thank you for your time and help in this matter.

Sincerely,

William Reyes Maldonado

## **Notice of Dispute**

**William Reyes Maldonado**
606 Beach Avenue APT 2
Bronx, New York 10473
Date of Birth: ████████
████5346

TransUnion LLC Consumer Dispute Center
PO Box 2000
Chester, PA 19016

04/12/2024

Letter to Dispute inaccurate Items on my credit Report

The following accounts are presenting inaccurate information on my credit report and I would like to place them in dispute for the following reasons:

1. Payment history is inaccurate
   AMERIHOME MORTGAGE COMPANY LLC
   Account Number: XXXXXXXX4434
   Please investigate this mortgage account, because it is missing data in the payment history. This mortgage was opened in June 2019 with Union Mortgage, and was transferred to Amerihome in June 2022. There is no data reporting in the payment history from June 2022 to October 2022. This is inaccurate and misleading. The payment history is missing several on-time payment remarks from June 2022 to October 2022. There is also missing data on March, April, August, September, and December 2023. Lastly, there is a 60 day late remark on January 2024. This is inaccurate because this mortgage was paid off and closed in January 2024. How can I be 60 days late in January when this is when I paid the loan off? Please investigate this account and make the necessary changes to my credit report. It is missing several payment remarks in the payment history, which is misleading and hurtful to my credit.

2. This is a duplicate account
   UNION HOME M
   Account Number: XXXXXXXXX4434
   This is duplicate account. This mortgage was transferred to Amerihome Mortgage on June 1st, 2022. There should not be any payment history reporting on this account after June 2022, because the loan was no longer with Union Home Mortgage. This is inaccurate and misleading, as this account is inaccurately reporting late remarks on April, September, and October 2023. The loan was not with Union Home Mortgage in 2023, so how can they be reporting these late remarks? Also, there are duplicate late remarks reporting on October 2023 on this Union Home Mortgage tradeline, and the Amerihome Mortgage tradeline. Both of these accounts are reporting a late remark for the same month, when these are for the same mortgage loan. This duplicate late remark is very hurtful to my credit. Please investigate this account and the data it is reporting, and make the necessary changes to my credit report, because the inaccurate payment history and

duplicate late remark, are hurting my credit.

3. Payment history is inaccurate
   ALLY FINANCIAL
   Account Number: xxxxxxxx0225
   Please investigate this auto loan because it is missing data in the payment history. This auto loan was opened in May 2013. There is no data showing in the payment history from 2015 to October 2018. There is also no data reporting in the payment history from December 2018 to August 2019 when the loan was paid and closed. The payment history is missing several on-time payment remarks that would be beneficial to my credit. The inaccurate reporting and lack of data showing in the payment history are hurtful to my credit. Please investigate this account and make the necessary changes to reflect the accurate on-time payments I have made throughout the life of this loan.

Please investigate the presented issues and make the necessary changes to my credit report, to reflect each account accurately. Enclosed are my identification documents, including my driver's license, SSN card, and a bill showing my address.

Thank you for your time and help in this matter.

Sincerely,

William Reyes Maldonado

ALERT: TROPICAL CYCLONE HELENE, FLOODING, AND SEVERE WEATHER IN THE SOUTHEA…

# USPS Tracking®

FAQs >

Remove ✕

Tracking Number:

## 9407111898765406907842

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item has been delivered and is available at a PO Box at 8:50 am on April 19, 2024 in ATLANTA, GA 30304.

Get More Out of USPS Tracking:

USPS Tracking Plus®

### Delivered
**Delivered, PO Box**

ATLANTA, GA 30304
April 19, 2024, 8:50 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** (https://faq.usps.com/s/article/Where-is-my-package)

Feedback

| | |
|---|---|
| **Text & Email Updates** | ⌄ |
| **USPS Tracking Plus®** | ⌄ |
| **Product Information** | ⌄ |

See Less ⌃

Tracking Number:    Remove ✕

Case 1:24-cv-08930-DEH-HJR    Document 1-1  Filed 11/21/24    Page 89 of 90

# 9407111898765406907705

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item has been delivered and is available at a PO Box at 12:22 pm on April 19, 2024 in ALLEN, TX 75013.

**Get More Out of USPS Tracking:**

  USPS Tracking Plus®

## Delivered

**Delivered, PO Box**
ALLEN, TX 75013
April 19, 2024, 12:22 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

**See More** ∨

Tracking Number:                                              **Remove ✕**

# 9407111898765406907989

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was picked up at a postal facility at 1:24 pm on April 19, 2024 in CHESTER, PA 19013.

**Get More Out of USPS Tracking:**

  USPS Tracking Plus®

## Delivered

**Delivered, Individual Picked Up at Postal Facility**
CHESTER, PA 19013
April 19, 2024, 1:24 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

FILED: BRONX COUNTY CLERK 10/14/2024 08:38 PM                    INDEX NO. 816499/2024E

NYSCEF DOC. NO. 10          Case 1:24-cv-08930-DEH-HJR   Document 1-USPS Tracking® Filed 11/21/24   Page 90 of 90   RECEIVED NYSCEF: 10/14/2024

**See More** ⌄

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**